708 P.2d 147

**SUN VALLEY COMPANY, a corporation, Plaintiff-Respondent,**

v.

**CITY OF SUN VALLEY, a municipal corporation, Defendant-Appellant.**

No. 15822.

Supreme Court of Idaho.

Aug. 29, 1985.

Mark W. Russell of Kneeland, Laggis, Korb, Collier, Benjamin & Russell, Ketchum, Terry E. Coffin and David H. Leroy of Runft, Leroy, Coffin & O'Riordan, Boise, for defendant-appellant City of Sun Valley.

Carl Burke and Bobbi Killian Dominick of Elam, Burke & Boyd, Boise, for plaintiff-respondent, Sun Valley Co.

James W. Phillips, Ketchum, for amicus curiae Cities of Ketchum, McCall and Idaho City.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. and Robie Russell, Deputy Atty. Gen., for amicus curiae, State of Idaho.

DONALDSON, Chief Justice.

In 1978, the Idaho legislature enacted the "City Property Tax Alternatives Act of 1978" I.C. § 50–1043 *et seq.*[1] (the Act). The purpose of the Act, set out in the original legislation, was to remove from property owners the burden of providing tax dollars for those non-resident services provided by resort communities.

Pursuant to the Act, the City of Sun Valley (the City) passed Ordinance # 123. This ordinance imposed a 5% tax on hotel and motel rooms and liquor by the drink and was approved by the City voters on December 15, 1978. Since the tax was limited to a five-year duration, on November 22, 1983, a new ordinance, Ordinance # 165, was passed. This is the ordinance currently in effect. It imposes a 5% tax on motel and hotel rooms and liquor by the drink and is limited to a four-year duration.

On September 14, 1983, the Sun Valley Company (the Company) filed a declaratory judgment action against the City to determine the validity of the Act, its subsequent amendments and the local ordinance passed pursuant to the Act. The Company asserted that the Act was an unconstitutional delegation of legislative authority to the City, that it was an unconstitutional local or special law, and that it violated the equal protection and due process clauses of the state and federal constitutions. On September 7, 1984, the Company filed a motion for summary judgment on all issues. After briefing and oral argument, the district court granted the Company's motion. The district court found that the Act delegated legislative authority to municipalities without adequate standards and therefore was unconstitutional. No ruling was made as to the Company's other challenges. This appeal followed.

## I.

The City argues that the Act is not a delegation of legislative authority and therefore, standards are not required. We

1. 1978 Idaho Sess. Laws, ch. 261, p. 567. Amendments to that legislation were subsequently adopted, and are as follows:

"50–1044. **Authority for resort city residents to approve and resort city governments to adopt, implement, and collect certain city nonproperty taxes.**—The voters of any resort city with a population not in excess of ten thousand (10,000) according to the most recent census within the state of Idaho, organized under the general laws of the state, special charter, or a general incorporation act, are hereby given the freedom to authorize their city government to adopt, implement, and collect one or more local-option nonproperty taxes as provided herein. A resort city is a city that derives the major portion of its economic well-being from businesses catering to recreational needs and meeting needs of people traveling to that destination city for an extended period of time. The corporate authorities of any such resort city are hereby given the freedom and authority to adopt, implement, and collect one or more local-option nonproperty taxes as provided herein, if approved by the required majority of city voters voting in an election as provided herein.

No local-option nonproperty tax proposal may be presented to resort city voters for approval or modification for a period of one (1) year after an election to approve or disapprove such tax. The election may be a special election conducted for the exclusive purpose of approving or disapproving such tax, or may be conducted as part of any other special or general city election." 1981 Idaho Sess. Laws, ch. 328, p. 687.

"50–1046. **City local-option nonproperty taxes permitted by sixty per cent majority vote.**—A sixty percent (60%) majority of the voters of any resort city voting on the question may approve and, upon such approval, any city may adopt, implement, and collect, subject to the provisions of this act, the following city local-option nonproperty taxes: (a) an occupancy tax upon hotel, motel, and other sleeping accommodations rented or leased for a period of thirty (30) days or less; (b) a tax upon liquor by-the-drink, wine and beer sold at retail for consumption on the licensed premises; and (c) a sales tax upon part or all of sales subject to taxation under chapter 36, title 63, Idaho Code." 1984 Idaho Sess. Laws, ch. 225, p. 542.

agree with the City. The Act is not a delegation of legislative authority, but rather an implementation of a constitutional authority that is not self-executing.

Art. 7, § 6 of the Idaho Constitution provides:

"**§ 6. Municipal corporations to impose their own taxes.**—The legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may by law invest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation."

The intent of this section was first discussed in *State v. Nelson*, 36 Idaho 713, 213 P. 358 (1923).

"Manifestly, the reason for placing this limitation upon the legislative power to tax is to give local communities, organized as municipal corporations, the power to impose upon themselves for their needs only such burdens in the way of taxation as they themselves determine through their governing officials." *Id.* at 719, 213 P. at 359.

Initially this section was held to apply exclusively to property taxes. *Leonardson v. Moon*, 92 Idaho 796, 803, 451 P.2d 542, 549 (1969). Under this interpretation, cities had broad authority to "assess and collect [property] taxes for all purposes of such corporation." *Hamilton v. McCall*, 90 Idaho 253, 259, 409 P.2d 393, 397 (1965). Then, in *Greater Boise Aud. v. Royal Inn of Boise*, 106 Idaho 884, 684 P.2d 286 (1984), we overruled *State v. Nelson* and held that the section also pertained to excise taxes. It stands to reason, then, that if cities have broad powers of property taxation under art. 7, § 6, they also have broad powers to impose excise taxes if authorized by the legislature through implementing legislation.

■ This interpretation is supported by a plain reading of the section. The first clause of art. 7 § 6 states: "[t]he legislature shall not impose taxes for the purpose of any ... city...." This clause is a limitation on the legislature's otherwise plenary powers in the area of taxation. Because of this clause, the legislature has no power to impose taxes for or on behalf of cities. The second clause of art. 7 § 6 allows the legislature to "invest in the corporate authorities ... the power to assess and collect taxes for all purposes of such corporation." Thus the grant of taxing power to cities is not self-executing or unlimited. It is limited by what taxing power the legislature authorizes in its implementing legislation.

Additionally, the legislature itself recognized that it was not delegating its authority under the Act but was "investing" the power in municipalities. I.C. § 50–1044 provides that "[t]he voters of any resort city ... are hereby given the freedom to authorize their city government to adopt, implement, and collect one or more local-option nonproperty taxes as provided herein."

II.

■ The Company urges that the trial court properly determined that the Act was a delegation of legislative authority, and, thus, under art. 3, § 1 of the Idaho Constitution which provides that all legislative power is vested in the senate and house of representatives, the Act must contain meaningful standards. The Company's argument fails for three reasons. First, it ignores the plain language of art. 7, § 6 of the Idaho Constitution as discussed above. Second, even if the Act is a delegation of legislative authority, the Company's analysis under art. 3, § 1 is misconceived. Historically, this section (as similar sections in other state constitutions and as in the federal constitution) has been interpreted to limit the delegation of legislative authority to other branches of government. *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932). The non-delegation doctrine, as it is called, traditionally required that laws delegating legislative authority to either the executive branch or the judiciary contain meaningful "standards." These standards were to insure that decision makers in the other branches, who

were not publicly accountable through the election process, would not act arbitrarily, capriciously or discriminatorily. However, because of the impracticality and the inflexibility of such a requirement, the non-delegation doctrine has long been dead in the federal courts, 1 K. Davis, Administrative Law Treatise § 3.2 (1978), and has since been recast in many state courts. *Id.* § 3.14. The modern view is that broad delegation of legislative authority is proper and indeed necessary. *Id.* § 3.15 (Supp. 1980) Instead of requiring standards to control discretion, the current view is that the legislation itself or the agency's internal guidelines should provide meaningful safeguards against arbitrary decision making; for example, a right to a hearing or judicial review of agency decision making. *See Warren v. Marion County*, 222 Or. 307, 353 P.2d 257 (1960).

■ The third reason that respondent's delegation argument fails is because the non-delegation doctrine is not precisely applicable to this case. The non-delegation doctrine is a doctrine of administrative law. In the usual case, the challenger attacks an agency's authority to make legislative determinations. In the instant case, the "delegation" at issue, the Act, is not to the executive branch, but rather to another legislative body.

### III.

■ The Company contends that the Act does not contain the safeguards required by *Greater Boise Aud. v. Royal Inn of Boise, supra.* However, even if *Greater Boise* would require safeguards in the present case, there are sufficient safeguards in the Act:

First, under the Act any tax proposed by the City must be passed by a 60% majority vote and may not be increased without subsequent majority approval. I.C. § 50–1047 requires that the ordinance which is submitted to the voters state and define the specific tax, state the exact rate of the tax, state the purpose for which the revenue is to be used and state the duration of the tax. These public voting requirements

ensure the tax will be reasonable because the tax may only be imposed by cities that derive the major portion of their economic well being from tourism. Also, the Act does not exempt the city residents from paying the tax they have approved. They will be buying liquor by the drink, beer, wine and making other purchases subject to a sales tax. It is unreasonable to assume that the city residents will impose a prohibitive tax upon themselves. Second, the election of local city council members who propose the tax is always a safeguard against arbitrary action by the city council. Finally, the legislature may always amend the Act, which it did in 1981 and again in 1984, or repeal the Act. Accordingly, even if the Company were correct that the Act requires safeguards, there are sufficient safeguards present in the Act.

Accordingly, the decision of the trial court with respect to this delegation issue is reversed.

### IV.

■ In its motion for summary judgment, the Company also raised issues of whether the Act is a local or special law in violation of art. 3, § 19 of the Idaho Constitution, and whether the Act violates the Company's state and federal equal protection or due process rights. The district court, having ruled that the Act was an unconstitutional delegation of legislative authority, did not reach these issues. However since the Company's motion for summary judgment stated that there were no factual issues in dispute and that the trial court could decide the constitutional issues as a matter of law, *Williams v. Paxton*, 98 Idaho 155, 163, 559 P.2d 1123, 1131 (1976); *Thompson v. Hagan*, 96 Idaho 19, 523 P.2d 1365 (1974), and since the matters are purely those of law, and were fully briefed and argued before us we will decide these issues. "When this court is squarely presented with a constitutional issue, as in this proceeding, it must rule on the issue." *Thompson, supra* at 24, 523 P.2d 1365. Each will be dealt with in turn.

## A.

■ Art. 3, § 19 of the Idaho Constitution prohibits the legislature from enacting local or special laws in matters of taxation. This Court has held that a law "is not special when it treats all persons in similar situations alike," *Twin Falls Clinic and Hospital Bldg. v. Hamill*, 103 Idaho 19, 26, 644 P.2d 341, 348 (1982), nor is it local "when it applies equally to all areas of the state." *School Dist. No. 25 v. State Tax Commission*, 101 Idaho 283, 291, 612 P.2d 126, 134 (1980). The test of whether a classification is local or special is whether the classification is arbitrary, capricious or unreasonable. *Washington County v. Paradis.*, 38 Idaho 364, 369, 222 P. 775, 369 (1923).

■ In this case, the Act applies to all resort cities with a population under 10,000 where tourism is the major industry. The legislative purpose accompanying the legislation is:

"Several Idaho resort communities spend significant amounts of money providing services for tourists who do not contribute significantly to the tax base of the community. In order to remove property owners from the burden of providing tax dollars for these non-resident services, we proposed to allow resort communities in counties with a population not in excess of 20,000 to implement and collect hotel-motel and/or liquor-by-the-drink taxes, providing that 60% of the majority of the voters in an election support the implementation of such taxes. The ordinance submitted to the voters must state and define the specific tax, state the exact purposes for which revenues will be used, state the rate of the tax and the duration of the tax." [2] Statement of Purpose, H.B. 373, 44 Idaho Legis., 2d Sess. (1978).

Thus the legislature took notice of the fact that resort cities are burdened by transient populations to a much greater extent than non-resort cities, and that such transient populations do burden the resort cities with additional costs and expenses for public services. Also, it is logical and reasonable for the legislature to believe that small resort cities, because of the disproportionate ratio of tourist to residents, require greater or different tax relief than the larger resort cities.[3] Larger resort cities obviously have a larger real property tax base to support public services to accommodate the transient influx. Small resort cities, on the other hand, have fewer real property owners and a smaller tax base to support the services necessary to accommodate such influx. Accordingly, the classifications in the Act are not arbitrary, capricious or unreasonable. Therefore, the Act is not an unconstitutional local or special law.

## B.

The Company also contends that the Act is a violation of its equal protection and due process rights under the state and federal constitutions. Since we have interpreted the equal protection clauses and the due process clauses of both the state and federal constitutions as substantially equivalent, a single analysis for each clause will suffice. *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976).

■ In this instance, the classification challenged is resort cities with populations under 10,000. Such a classification is not "suspect," *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), nor does it involve a fundamental right," *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Therefore, the classification will withstand an equal protection challenge if "there is any conceivable state of facts which will support it, and the burden is upon the one attacking the legislative arrangement to

2. The Act has since been changed to apply to resort cities with a population of 10,000 or less.

3. The resident population of Sun Valley is 550, during peak season it jumps to 8,000. At oral argument, counsel for the City pointed out that a comparable population increase for Boise would be from 100,000 to 1,500,000.

negative any conceivable basis which might support it." *School Dist. No. 25*, 101 Idaho at 288, 612 P.2d at 131. We have already held that there are valid differences supporting the legislative classification between resort cities under 10,000 and all other cities and, thus, the classification withstands this equal protection challenge.

The Company also argues that as applied the Act is discriminatory because in Sun Valley the tax is 5% whereas right next door in Ketchum the tax is 1%. However, again there is a rational basis to support such a distinction. Not only does each resort city have varying needs, but the percentage influx of tourists varies with each city's population. For example, the percentage increase during Ketchum's peak season is 309% as compared to Sun Valley's at 1,355%. Therefore, the Act does not violate the Company's equal protection rights under either the state or federal constitutions.

The Company's due process challenge must also fail. Assuming there is a liberty or property interest at stake, if there is a rational basis to support the challenged regulation, it will be upheld. *See Jones v. State Board of Medicine, supra* 97 Idaho at 866, 555 P.2d at 406. For the reasons stated above, there is a rational basis to support the legislative purpose of the Act.

The judgment of the district court is reversed and remanded for proceedings consistent with this opinion.

Costs to appellant.

No attorney fees on appeal.

HUNTLEY, J., concurs.

BAKES, J., concurs in all but Part II, in which he concurs in the result of Part II.

SHEPARD, Justice, dissenting.

I cannot agree with the majority's analysis of the "delegation" question. All previous opinions of the Court, including *Greater Boise Auditorium v. Royal Inn of America*, 106 Idaho 884, 684 P.2d 286 (1984), have dealt with the ability of municipalities and other local units of government to tax as being delegated authority by the legislature. Although *Greater Boise Auditorium* overruled *State v. Nelson*, 36 Idaho 713, 213 P. 358 (1923), the delegation of legislative authority analysis was not disturbed. Likewise, although *Greater Boise Auditorium* did not involve a municipality, nevertheless it was my view that the artificial distinction between municipalities and other local units of government was abolished in *Greater Boise Auditorium*. I see no reason, and the majority has furnished none, to abandon the legislative delegation analysis of *Greater Boise Auditorium*. I see the majority's utilization of the specific constitutional language as unavailing, and view the distinction between "investment" and "delegation" as a distinction, if any, without a difference. To that extent I agree with that portion of the dissent of Bistline, J.

Necessarily then do I view it necessary to examine the safeguards attempted to be provided here with those safeguards approved in *Greater Boise Auditorium v. Royal Inn of America, supra*. I view the failure of the legislature to prescribe a maximum amount of tax which may be levied as contrary to the strictures of *Greater Boise Auditorium*. I cannot agree with the majority that the requirement that the imposition of the tax must be approved by a large segment of the voters is a panacea and substitute for the otherwise safeguards required by *Greater Boise Auditorium*. I would have less concern if the tax were general in nature, such as a sales tax on all retail sales, which would impact all citizens and businesses uniformly. In the instant case, however, the tax is clearly designed to impact and raise money from a transient group of people not permanent residents of a municipality. That tax will be collected by businesses renting accommodations for that transient population or selling intoxicants by the drink to that same transient group. While such a tax scheme is not perhaps unlawfully discriminatory per se, it nevertheless selects a relatively small and select number of business-

es as targets for the tax. Hence, with perhaps a jaundiced eye it is my view that the "safeguard" found by the majority in the election approval process is largely illusory and insufficient to replace the necessary safeguards enunciated in *Greater Boise Auditorium.*

BISTLINE, Justice, dissenting.

Under a correct application of principles of Idaho constitutional law, the City Property Tax Alternatives Act of 1978, and subsequent amendments thereto, should be held unconstitutional, and the district court's judgment upheld and endorsed.

## I.

The majority, by declaring that the 1978 City Property Tax Alternatives Act was not a "delegation" of authority to begin with, but instead an "authorization" thereof, sidesteps the first and most important issue—whether the legislature delegated taxing authority to municipalities without adequate standards. This semantical gamesmanship is not in the least persuasive in light of recent decisions by this Court on this very issue.

## A.

In *Greater Boise Auditorium Dist. v. Royal Inn of Boise,* 106 Idaho 884, 888, 684 P.2d 286, 290 (1984), this Court unanimously upheld as constitutional I.C. §§ 67-4917A through 67-4917C, which authorizes the Greater Boise Auditorium District to impose a sales tax on receipts derived from the furnishing of hotel and motel rooms. The basis for upholding the statute was that *"in any delegation of legislative authority to a lesser entity of government,"* it is imperative that *"certain constitutional standards ... be met."* *Id.* (Emphasis added.)

In *Greater Boise* this Court held that adequate safeguards exist in the statute there at issue. The Court pointed out explicitly that those safeguards include a specific definition of the tax imposed, clearly defined exemptions, a cap on the amount of tax which can be imposed, a precise delin-

eation of the administration and collection of the tax, and specificity as to where reposes the power to impose the tax.

The import of *Greater Boise* is twofold. First, the Court made clear that the legislature's empowering of the Auditorium District with the authority to tax was a *delegation* of power. Second, this Court reiterated a long line of Idaho cases that have declared that *any delegation* of legislative authority must be accompanied by adequate standards and guidelines. *See Kerner v. Johnson,* 99 Idaho 433, 583 P.2d 360 (1978); *State v. Kellogg,* 98 Idaho 541, 568 P.2d 514 (1977); *Board of County Commissioners of Twin Falls County v. Idaho Health Facilities Authority,* 96 Idaho 498, 531 P.2d 588 (1976); *Boise Redevelopment Agency v. Yick Kong Corp.,* 94 Idaho 876, 499 P.2d 575 (1972); *State v. Heitz,* 72 Idaho 107, 238 P.2d 439 (1951).

The majority's decision today cannot be reconciled with *Greater Boise.* What *Greater Boise* declared to be a delegation of power, today's majority labels an "investing" of power. What *Greater Boise* declared to be necessary concerning proper and adequate standards of delegated taxing authority, today's majority, sidesteps with an entire section of dicta by finding new and different standards, which today are said to be acceptable. That *Greater Boise* held that such proper standards are required in such a delegation of power, today's majority holds otherwise, leaving the inference—and an incredible one at that—that where the legislature "invests" a municipality with taxing authority, no constitutional requirements in that "investing" need be satisfied.

What is further deplorable is that no reason is offered to explain why *Greater Boise*—a one-year-old, unanimous decision of this Court—no longer should be followed, and is no longer good law. Because *Greater Boise* was neither criticized, discussed, analyzed, or distinguished, I am at a loss, and I am sure members of the bench and bar will join with me, in determining its present status. If today's opinion is really

intended to be the rule with respect to the power of the legislature to delegate its taxing authority, then *Greater Boise* can only be viewed as having been overruled. Eighty plus years of judicial precedent, as well as the formulation of constitutional criteria by which each legislative delegation of such taxing authority can be evaluated for its validity can also only be viewed as having been tossed out the window. Such à monumental change should not come about without reason to do so.

Besides ignoring *Greater Boise* for all substantive purposes, the majority likewise gives scant attention to *State v. Nelson*, 36 Idaho 713, 213 P. 358 (1923). While *Greater Boise, supra,* overruled *Nelson* with respect to its holding that the legislature may only delegate property tax authority, it did not attempt to overrule *Nelson's* ruling with respect to the standards a proper delegation must meet. In fact, the unanimous *Greater Boise* Court approvingly quoted District Judge Ray Durtschi's interpretation of *Nelson*, which reads as follows:

> In short I think the Nelson case really holds that the purported grant of power in Art. 7, sec. 6, did not do away with the separation of powers doctrine, but that the legislature had to act within and in conformance with the doctrine of separation of powers in delegating authority to cities and counties to impose or assess taxes. This obviously had not been done in the statute involved in that case.
>
> *Greater Boise, supra,* 106 Idaho at 888, 684 P.2d at 290.

What did this Court do in *Nelson*, which in substance was approved of by this Court in *Greater Boise* just one year ago? Declare fundamental principles of state constitutional law regarding the legislative authority to delegate taxing power, and emphatically declare that requisite standards must accompany any delegation of power, in particular the taxing power. Said the *Nelson* Court:

> When we consider the power which the legislature is authorized to confer upon municipal authorities in the matter of

raising revenue by direct taxation, ... together with the limitations and restrictions which the legislature has itself placed upon the authorities of cities and towns in the matter of levying and collecting taxes and prohibiting the expenditure of the revenue thus raised before this is done, *we conclude that the organic law does not contemplate or authorize the legislature to invest cities or villages with any such unlimited power of taxation as is here contended for,*
>
> . . . .
>
> . . . .
>
> In view of the guarded manner in which the legislature has invested the authorities of cities and villages with the power to assess property and collect revenue for corporate purposes, and of the almost universal restrictions and limitations found in the various provisions of the statute limiting the power of the governing boards of counties, cities, villages and other subdivisions of the state, it is not believed that the legislature intended by C.S., sec. 3945, to give to the authorities of cities and villages the power without any limitation to raise any amount of revenue that such governing boards may decide necessary for municipal purposes, by a license tax upon the citizens and the business or professions carried on in these municipalities, or by a per capita tax upon the inhabitants of such cities and villages. *But if it was the purpose of the legislature to invest the governing boards of municipalities with such unrestricted power, we think that such power is not given to the legislature by the organic law, and that it cannot invest such authority in municipal corporations.*
>
> *Nelson, supra,* 36 Idaho at 721–23, 213 P. at 360–61 (emphasis added).

In view of the way the majority has swept *Greater Boise* under the rug, it is not surprising that it would do the same to *Nelson,* too. Other than this Court's modification of *Nelson* in *Greater Boise,* though, *Nelson* has withstood the test of time and proven to be a decision grounded

in sound constitutional law. In its 62-year history, it has been cited over 30 times. Its requirement that proper safeguards accompany any delegation of taxing authority, therefore, should not be so easily and cavalierly bypassed through resort to semantic gamesmanship.

### B.

While art. 7, § 6 of the Idaho Constitution does prohibit the legislature from *imposing* taxes "for the purpose of any county, city, town, or other municipal corporation," it does not prohibit the legislature from *delegating* its general taxing authority to such municipalities. The second clause of art. 7, § 6 makes this clear, wherein it states that the legislature may *"invest"* in municipalities such authority "for all such purposes" of the municipality.

The majority's holding that "investing" does not mean a "delegation" borders on the farcical. Webster's New Collegiate Dictionary defines "invest" as "to furnish with power or authority." It defines "delegate" as "to assign responsibility or authority." Both definitions appear to be synonomous, and *Roget's International Thesaurus* under "giving," declares that the words "invest" and "delegate" are synonyms of the same word.

Accordingly, the proper construction of art. 7, § 6 is as follows: The legislature cannot tax on behalf of a city, county, or other municipality. It may, however, give such a power to the municipalities so that they can assess taxes for their own behalf. This granting of such a power is tempered by the constitutional requirement—which is rooted in art. 3, § 1 of the Idaho Constitution and which is detailed below—that there be adequate safeguards and standards under which the municipality must operate.

The majority's approach—that "invest" does not mean "delegate"—borders on Orwellian doublespeak and ignores fundamental principles of constitutional interpretation, including the rule that the plain, ordinary meaning of words used should be that which is applied in interpreting the particular section in issue. *See, e.g., Division of Elections of State v. Johnstone,* 669 P.2d 537 (Alaska 1983), *appeal dismissed, cert. denied* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984); *Second Amendment Foundation v. City of Renton,* 35 Wash. App. 583, 668 P.2d 596 (1983); *McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 645 P.2d 801 (1982); *State v. Cardwell,* 187 Mont. 370, 609 P.2d 1230 (1980), appeal after remand 625 P.2d 553. Accordingly, the issue this Court should be addressing, then, is whether the City Property Tax Alternatives Act is a proper delegation of legislative authority. That is, whether the Act contains adequate constitutional standards and safeguards by which the municipalities acting under the Act must operate. To properly answer this question, the Act must first be reviewed.

### II.

The City Property Tax Alternatives Act of 1978 is found at I.C. § 50–1043 *et seq.* In § 50–1044 the Act states that "resort cities with a population not in excess of 10,000 . . . are hereby given the freedom to authorize their city government to adopt, implement, and collect one or more local option non-property taxes as provided herein." A resort city is defined as a city "that derives the major portion of its economic well-being from businesses catering to recreational needs and meeting needs of people traveling to that destination city for an extended period of time."

I.C. § 50–1046 allows resort cities to choose from three different taxes: (1) "an occupancy tax upon hotel, motel, and other sleeping accommodations"; (2) "a tax upon liquor by-the-drink, wine and beer"; and (3) a sales tax upon part or all of those sales which are subject to the general sales tax throughout the state.

When it originally passed the City Property Tax Alternatives Act in 1978, the legislature included the following statement of purpose:

Several Idaho resort communities spend significant amounts of money providing

services for tourists who do not contribute significantly to the tax base of the community. In order to remove property owners from the burden of providing tax dollars for these non-resident services, we proposed to allow resort communities in counties with a population not in excess of 20,000 to implement and collect hotel-motel and/or liquor-by-the-drink taxes, *providing that 60% of the majority of the voters in an election support the implementation of such taxes.* The ordinance submitted to the voters must state and define the specific tax, state the exact purpose or purposes for which revenues will be used, state the rate of the tax and the duration of the tax. (Emphasis added.)

As the purpose reveals, before a resort city can select one of the available local option taxes, all that is required is that a 60 percent majority of the voters must approve of the tax. I.C. § 50–1046. With the Act in mind, let us turn to an evaluation of its standards and safeguards.

### III.

A review of the City Property Tax Alternatives Act reveals several constitutional deficiencies. First, it inadequately defines "resort city," which is supposed to be the recipient of the new taxing authority. Second, it provides no limit upon the amount of tax that can be collected. Finally, it does not mandate that the city solely use the revenue gained from the tax for the reasons under which the Act was first passed.

### A.

The definition of "resort city" is ambiguous. For convenience sake, I requote the definition: "A resort city is a city that *derives* the *major portion* of its *economic well-being* from businesses *catering to recreational needs* and meeting needs of people *traveling to that destination city for an extended period of time.*" (Emphasis added.)

No definition of "major portion" is included in the legislation. Does it mean over 50 percent of the business receipts within the community? Are only receipts from businesses located within the city counted? What is to be done about counting business receipts from businesses not within the city boundaries but nevertheless in the area competing in the same markets as those businesses located within the city? How does a city "derive" economic well-being? Does "derive" mean the income earned by city residents or just the tax revenues the city is receiving?

The preceding two questions introduce the next problem. No definition of "economic well-being" is included in the legislation. What does it mean? When is a city doing well economically? When its tax receipts are up? When budget surpluses exist?

In any event, assuming we do know the meaning of "derives," "major portion" and "economic well-being," we also must ascertain what "catering to recreational needs" means. Does "recreational" include dance halls, hotels, restaurants, bars, and motorhome lots? If so, then, as respondent Sun Valley Corp. points out, cities such as Garden City would also qualify as "resort cities" because they surely derive a "major portion" of their "economic well-being" from such businesses.

Finally, what does "meeting needs of people traveling to that destination city for an extended period of time" mean? Many so-called "resort cities," such as Idaho City have very few rooms within the city that are available for tourists. If the above phrase means people traveling to a city and intending to stay there, then these cities apparently would not qualify as resort cities. Finally, how long does a tourist need to stay to constitute an "extended period of time"? One hour? One day? One week?

With such an inartfully drawn definition of "resort city," a wide range of problems arise.[1] The most serious is that scores of

---

**1.** A most interesting case where a majority of    the Court took a more decided interest in the

small towns never contemplated by the legislature as being "resort cities" may nevertheless qualify. That potentiality, when combined with the unlimited power and discretion to tax and spend which is granted by the Act—and which will be discussed more in detail below—invites abuse under an exercise of powers only the legislature is constitutionally permitted to exercise.

### B.

The City Property Tax Alternatives Act gives local municipal authorities uncontrolled discretion to determine when to impose a tax, what tax to impose, at what rate it should be fixed, how long it should last, what purposes for which the tax revenues thus obtained will be used, what system to be used to administer and collect the tax, and what conditions to ultimately be imposed upon those responsible for the tax.

This delegation of authority is virtually limitless. By no stretch of the imagination can it be said to contain adequate standards as set down in prior cases concerning this issue.

As mentioned above, *Greater Boise* sets forth what constitutes adequate standards by which a delegation of taxing power can be upheld. Specifically mentioned were (1) clear definitions of *who* could tax and *what* could be taxed; (2) an established *upper tax limit* by which the Auditorium District could not exceed in imposing a tax; (3) a *clear purpose* for which the revenues thus earned must be spent; and (4) *specific details* by which the tax would be administered and collected.

Turning now to the second and third criteria set forth above, I find that the City Property Tax Alternatives Act is unsatisfactory on both accounts.

1. Perhaps the most glaring inadequacy in the Act is the lack of limitation upon the amount of the tax that can be imposed. In *Greater Boise*, the Auditorium District could only set a tax rate of five percent at the most. No such limitation exists here. Thus, a tax of five percent, 50 percent, or 500 percent could be imposed under the Act. Such an unlimited delegation of taxing authority can only be viewed as an improper and unconstitutional passing on of taxing functions by the legislature to the local municipal authorities of the "resort" cities.

2. The Auditorium District Act—the Act that was challenged in *Greater Boise*—defined the purposes for which taxes raised by the Act could be expended. The purposes are those for which the Auditorium District was established—"to build, operate, maintain, and manage ... public auditoriums, convention centers, ... and facilities of a similar nature." I.C. § 67–4902.

No such limitation exists in this case. Thus, a resort city can use the tax revenues from the local option taxes for *any* purpose it so chooses. Nothing prevents a city government so inclined from using the extra income to pad its budget in a multitude of ways, ranging from providing laudable, reasonable services, such as increased police and fire protection, to providing opulent, unnecessary "services" such as marble-floored restrooms. While the latter most probably would never happen, it does point out the constitutional infirmity in the City Property Tax Alternatives Act, *because nothing in that Act would prohibit use of the Act's tax-granting powers* to fund such ill-starred projects.

Unmentioned by the majority is I.C. § 50–1045, which states:

**City property tax relief fund.**—Any resort city *may* establish a city property tax relief fund into which *may* be placed all or any portion of revenues received from any nonproperty tax levied in accordance with the provisions of this act and such nonproperty tax revenues *may* be used to replace city property taxes in the ensuing fiscal year by the amount of nonproperty tax revenues placed in the city property tax relief fund

legislative choice of words is *State v. López,* 98 Idaho 581, 570 P.2d 259 (1977), where a conviction of prostitution was set aside because of the legislature's failure to provide complete definitions.

if city voters have approved of such use of nonproperty tax revenues in the election authorizing such city nonproperty tax. Any resort city that receives more revenues from any local-option nonproperty tax than such city has budgeted *shall* establish a city property tax relief fund into which shall be placed all revenues received in excess of the budget amount and such excess revenues shall be used to replace city property taxes in the ensuing fiscal year by the amount of all excess revenues placed in said city property tax relief fund. (Emphasis added.)[2]

Section 50–1045, by its nonmandatory terms, and the giant loophole it contains, is, for all practical purposes, a meaningless safeguard. First, it is meaningless, because it is not mandatory, as the City of Sun Valley quickly points out in its reply brief, unless revenues received exceed the amount budgeted for that year. Second, it is meaningless, because it is readily apparent that there might never be *any* budget surplus since the City's budget can in turn be unlimited, which the City of Sun Valley also candidly admits in its brief.

Nothing in the present Act adequately bridles the taxing power and discretion of the local municipal authorities involved. The Act permits these authorities to use *any* or *all* of the available taxes. It also allows, under the sales tax provision, these authorities *carte blanche* to impose an additional sales tax of *any* amount upon *any* item or items. Such broad, unfettered discretion and power is tantamount to that exercised by the legislature and can only be viewed as an improper delegation of that authority, because art. 3, § 1 vests only in the Senate and House of Representatives the legislative power of the state of which the power to tax is included. *Greater Boise, supra,* 106 Idaho at 885–86, 684 P.2d at 287–88.

It continues to be my view that appellate review breaks down and thoughts of judicial economy are frustrated when this Court completely ignores the excellent

work product of a district judge, but rather starts afresh as though the issue presented had never before been addressed and decided. Appellate review here would properly consist of first reviewing the district court's opinion, becoming fully acquainted with it, and then proceeding to illustrate wherein it errs—if such is so. The more that I turn to Judge Granata's opinion, the more convinced I am that it is not just thorough and scholarly, but entirely sound. The trial bench and bar, and the people of the state as well, are entitled to see laid side by side this Court's judgment and the lower court's judgment. Accordingly, pertinent portions of the lower court's decision are found appended hereto.

IV.

My disagreement with Parts I, II and III of the majority opinion is exceeded only by my disenchantment with its Part IV which is premature. Therein the majority embarks upon a determination of state and federal challenges of denial of equal protection and due process. The majority says that *Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974), stands for the proposition that we must rule when squarely presented with a constitutional issue. The only way it can be said that these issues were presented lies in the fact that the City of Sun Valley, in its brief, declared them to be issues, even though none were ruled upon below by the district court.

Sun Valley Co. specifically pointed out in its brief, and again at oral argument, that constitutional issues other than an improper delegation of powers would not be ripe for determination until evidentiary hearings had been held. The delegation of powers issue was decided below in summary judgment proceedings as a matter of law. The district court did not conduct the necessary evidentiary hearings, though, for the obvious reason that the holding of an unconstitutional delegation of powers was dispositive so long as it remained unscathed by an appellate court. According-

---

2. There is no evidence in the record that the City of Sun Valley has followed this procedure.

ly, for that reason, and, one may readily surmise, also to oblige counsel for both sides who would naturally be desirous of going upstairs to get the final word, the partial summary judgment was certified as final for purposes of appeal. On that state of the record the district court continues to have jurisdiction of the remaining issues, and on remand is *the* proper court in which those issues should be first decided.

Sun Valley Co. in its brief rather omnisciently remarks that "appellant, for some reason, feels the need to urge this Court to decide issues that are not yet ripe for review." The "some reason" behind appellant's (City of Sun Valley) tactics is most likely its hope to avoid any evidentiary hearing whatever and now hurriedly obtains curbstone opinions from this Court on constitutional issues involving due process—which will emanate without the benefit of any due process in the process of being obtained. Strangely, that hope is being fulfilled by an obliging majority of this Court.

Other than for the fact that three members of this Court can do anything they want in any manner at any given time, there is no reason whatever for the Court to reach out and usurp the district court's continuing jurisdiction. To say, as the majority does, that the constitutional issues other than improper delegation of powers must be reached under the holding of *Thompson* is at the least an overstatement. What most interested readers will see is that the majority has determined to here and now place its full approval upon the challenged legislation. Which leads to an examination of the *ratio decidendi* by which it does so.

To support its conclusion in Part IV that the Act in question is not an unconstitutional local or special law, and does not violate equal protection or due process, the majority offers only a series of *ipse dixit*s:

(1) "The legislature took notice of the fact that resort cities are burdened by transient populations to a much greater extent than non-resort cities, and that such transient populations do burden the resort cities with additional costs and expenses for public services."

(2) "Also it is logical and reasonable for the legislature to believe that small resort cities, because of the disproportionate ratio of tourist to residents, require greater or different tax relief than the larger resort cities."

(3) "Larger resort cities obviously have a larger real property tax base to support public services to accommodate the transient influx."

(4) "Small resort cities, on the other hand, have fewer real property owners and a smaller tax base to support the services necessary to accommodate such influx."

Nothing in the record supports these bare-bones statements. Furthermore, no evidentiary hearing has yet been held so that it can be decided whether the Act, *as applied*, violates equal protection, due process, or any other constitutional guarantee. The issues in this case are of tremendous significance. That they necessarily must be decided sometime does not justify the majority's precipitate action in doing so in a vacuum.

It is hornbook law that an appellate court will not consider evidence not presented to the district court. *Pilcher v. State Department of Social Services*, 663 P.2d 450 (Utah 1983); *Thompson v. Arizona Department of Economic Sec.*, 127 Ariz. 293, 619 P.2d 1070 (Ariz.App.1980); *Salt City Business College, Inc. v. Ohio Casualty Insurance Co.*, 4 Kan.App.2d 77, 602 P.2d 953 (1979); *LaMon v. City of Westport*, 22 Wash.App. 215, 588 P.2d 1205 (1978); *Family Provisioners, Inc. v. Columbia Acceptance Co.*, 274 Or. 303, 545 P.2d 1379 (1976). Equally true, an appellate court should avoid deciding any issue, let alone issues of constitutional dimension, on bare *ipse dixits*, wholly unsupported by a non-evidentiary record.

It is important to note that respondent Sun Valley Co.'s equal protection challenge is *not* solely a facial attack, but that the legislation in question is also constitutionally infirm *as applied*. Were one to assume

that the Act is not unconstitutional on its face, a determination of whether it is unconstitutional as applied still needs to be undertaken.[3] Reason, precedent, and fairness require that issues not decided below, and requiring factual determination, be first decided in the trial court.

## V.

"The power to tax involves the power to destroy." *McCulloch v. Maryland*, 4 Wheat. 316 (1819). It is not a power that should be permitted to be exercised so freely. Only with clearly defined limits and standards established by the legislature, in which the taxing power resides, can such a power be delegated. As counsel for Sun Valley eloquently stated:

"I would like to begin by quoting from James Madison in a portion of *The Federalist Papers*. He said: '*The apportionment of taxes on the various descriptions of property is an act which seems to require the most exact impartiality; yet there is, perhaps, no legislative act in which greater opportunity and temptation are given to a predominant party to trample on the rules of justice. Every shilling with which they over-burden the inferior number, is a shilling saved to their own pockets.*' (Emphasis added.)

"In the area of taxation, whereas here, you could work out a statutory framework that gives full and unfettered discretion to a city where one company is in the minority and the other 581 citizens who aren't employed by that company have the right to decide what tax to impose, what to impose it upon, how long to impose it, at what rate to impose it, for what purpose to impose it, and finally, how long to impose it, means that you've given them the full kind of discretion that James Madison was talking about.

"First I should say that this is not a case where the respondent contends that an appropriate statute could not be drafted to protect or assist certain cities in Idaho be-

cause of peculiar problems related to the influx of tourists. It's not a case where we're arguing about the construction of the statute, because that's not the issue before this Court. The only issue decided by Judge Granata and the many issues presented by respondent was that this statute constituted unlawful delegation of power from the legislature to the City of Sun Valley.

"We also raised questions of local and special law and equal protection. The court did not decide those. Those kinds of questions are questions of fact. Most lawyers, in dealing with equal protection in the question of local and special laws, and whether they're arbitrary or whether they fit the class for which they're intended, often fail to bring out the facts which you have to do at the trial level. We never got to that point, even though I must say that if, as a matter of law, there ever was a question of where equal protection may be denied or where we indeed have one of those rare birds of local and special law, this may be it.

"What I think, though, is clearly the very crux of the matter is whether or not the Idaho legislature has the power to let a couple resort cities do their own thing. I think we all have to agree that the guts of any tax statute are these: the definition of the specific tax, the purpose for which the revenue was to be used, the rate of the tax, and the duration of the tax.

"In reading from the very statement of purpose of the Real Property Alternatives Act of 1978, the legislature gives to the city the power to submit—to make the decision then submit to the voters the following, and I'll quote: "The ordinance submitted to the voters must state and define the specific tax, state the exact purposes for which revenue will be used, state the rate of the tax, and the duration of the tax. Indeed, that's what tax laws are all about. The supposed guidelines they talk about in

---

**3.** The majority seemingly concedes that the Act must also be evaluated as applied by disposing of that problem with a paragraph which de-

clares the constitutionality. This may seem incredible to Sun Valley Co., where no evidentiary hearing has ever been conducted.

the statute that was there are really definitions defining who can be a resort city.

"This particular statute, as amended, gives the City of Sun Valley a potpourri opportunity to pick and choose from a whole variety of taxes who it will tax and what the tax will be. For example, the act as now amended provides that the city may place a sales tax on all or any part of those items that are taxed under our state sales tax act.

"And what has happened? Well, in Ketchum—a new ordinance is a part of the briefs has been submitted by appellants. In Ketchum they've decided to have a one percent sales tax on everything but the sale of automobiles and the sale of building materials. In the City of Sun Valley, which is right across the line, they have a five percent tax on rooms and hotels and in Ketchum it's two percent—one percent sales tax and one percent tax. The Sun Valley Company provides over two-thirds of the resort tax revenue as one tax payer to the City of Sun Valley. Even today, I read in the paper, that the City of McCall is voting on whether to abolish their room tax and booze tax of four percent because the restaurant and motel owners would not agree with the city council that could be replaced by a one percent sales tax.

"So this legislature has granted to cities the power to do with as they will and carefully try to, I think, fool this Court into believing that because there is a vote on the ordinance prepared by the city council, that's a savior. I want to agree with my distinguished colleague, Mr. Leroy, that this is an important constitutional case. It's even more important when one considers the position taken by the Attorney General in his brief and ascribed to by counsel.

"They claim this is not a delegation of power case, but in fact this vote, this vote by the people which is a condition for the ordinance going into effect is, in fact, a referendum, despite the statutory requirements for a referendum, and once there is this kind of vote, the action of the people of Sun Valley 'is not subject to the doctrine of delegation, due process, or equal protection.' I'll repeat, that once the vote is taken, that what they have done in the City is not subject to the 'doctrine of delegation, due process, or equal protection.' And, on page 12 of the Attorney General's brief it says: 'As a consequence, when there is such a vote there is no need for safeguards, standards, guidelines, restrictions, or qualifications.'

"I want to submit that is constitutional heresy and I think overlooks our history, overlooks what has happened. The fact is, if a vote of the people in any city can override the legislation doctrine of delegation and equal protection of the laws, we're very much in the same posture we would be if we were in a Russia or a Cuba. That means, by a vote of the people, you could force people back into the back of the buses. You could have had referendums in the South in the mid-fifties to eliminate those peoples' rights of due process who had unpopular views. Indeed, I think it was put well in *Reitman v. Mulkey* [387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830], a Supreme Court case quoted in our brief, where the Supreme Court of the United States clearly held that an initiative in the state of California that permitted people to sell houses to whomever they wanted to was unconstitutional because it eliminated the civil rights and the first amendment rights of people that that act was aimed at, in spite of the fact that the state had nothing to do with the initiative.

"But again a quote from Madison: 'Wherever the real power in a government lies there is a danger of oppression. In our government the real power lies in the majority of the community and the invasion of private rights is chiefly to be apprehended not from the acts of government contrary to the sense of its constituents, but from acts in which the government is the mere instrument of the major number of the constituents. This is a truth of great importance, but not yet sufficiently attended to.' 5 Writings of Madison, quoted in the *Mulkey* decision.

"I think counsel overlooks the fact of what happened in this state. This state, in

1889 in the Admissions Act as we know, adopted the Constitution and it was adopted by the people at election held therefore on the first Tuesday of November 1889 which constitution is republican in form and is in conformity with the Constitution of the United States. It was that point in time that the people of this state decided that they would delegate the legislative power to the House and Senate of representatives of the state of Idaho. That's what they did. That's the delegation that's occurred and the vote of the people today can't abrogate that delegation of the will of the people of this state. That's fundamental. That is fundamental.

"Now, what did the people of the state of Idaho mean when they adopted art. 7, § 6? The language there is two sentences, as we know, and you always have to go back and read these provisions and think about them and contrast them with the other section of the Constitution that does give a grant of power to the cities. That's art. 12, § 2.

"Art. 7, § 6 says, the first sentence, that: 'The legislature may *not* impose taxes for the purpose of any county, city or town, or municipal corporation, but may by law invest in the corporate authorities thereof respectively the power to assess and collect taxes for all purposes of such corporation.' That clearly requires legislative action. It's been held by this Court over 80 years to do so. It's been repeated again and again, not only by this Court, but by responsible writers who've written on the subject, including the law review article of Mike Moore, including the very long Attorney General's opinion by Attorney General Kidwell, and including the Constitutional Revision Commission, which has been cited, in which they held clearly the legislature had the power and the duty to proscribe the limit of the tax and its purposes.

"The Constitutional Convention talked about it. It's not very long so I think it's worthwhile to listen to what Mr. Ainslie, who spoke frequently at that convention, said about it. A Mr. Beatty had a question. 'It strikes me that the language of the first line is rather obscure. The legislature shall not impose taxes for the purpose of any county. It ought to be the legislature shall not impose taxes upon the property of any county, if I understand the meaning of it.' Mr. Haberd: 'I do not understand that to be the meaning.' Mr. Beatty: 'Then I do not know the meaning of it and I call upon the chairman for explanation.' Mr. Ainslie: 'I believe I can explain that to the gentleman. I understand this is taken from Colorado also [as much of our constitution was]. The legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation. Now, under the revenue law, the state may exact a levy of so much for state purposes and authorize the county to levy a tax not exceeding so much, and then the county commission of each county to levy their own rate. In one county it may be more than it is in another. If the state makes a levy itself, if the legislature makes a levy the rate of taxation in each county in the territory would be exactly the same. But, they authorize the different counties to levy a rate of taxation between so much not to exceed so much. And they can go under that any amount they please. It is to levy a tax not to exceed so much.' Nothing could be clearer, Mr. Ainslie thought. And right below that the question came up and it was put to a vote and carried.

"There is no limit here, Gentlemen, and you know that. And this Court made it perfectly clear in the *Greater Auditorium District* case, that it was following, in respects to the questions of delegation, the *Nelson* case. It is also held in *Powers v. Canyon County* this year, that there must be a lawful delegation of authority to counties and there must be guidelines and there must be certain reasonable standards set out by the legislature.

"The cases in which there has been no one unlawful delegation of power are those cases in which the city is to establish certain facts, or find facts, or determine certain conditions go into effect, but not—not to have that unfettered power of the legislature to make the principal decisions itself. Indeed, if counsel is correct, all the legisla-

ture would have to do, if there is a grant of powers to the cities to tax, would be to tell them, levy a tax upon any person's income in whatever amount you choose, as long as it's for a public city purpose. Levy a tax on corporations in any way, or on any property, or intangibles, or estates, or take a particular sale, as they did here.

. . . .

"The referendum . . . was not part of the original constitution. It came in 1911 and was stated in *Kramer v. Johnson* that the referendum was only effective if the legislature acts, and so there was no referendums or initiatives until 1933 when the legislature acted. If the legislature hadn't acted, you couldn't have referendums or initiatives today. It wouldn't be permissible because the constitution vested the power in the legislature to set the rules for referendums.

"I think the city concedes, in fact states in its brief, this is not a referendum. The Attorney General says it is a referendum. But it's not—clearly not—a referendum. It's a vote by the people on an ordinance that was prepared by the city when they made the basic decisions of what kind of tax law it would be. If you, indeed, would permit the legislature to have this broad, broad system of delegation powers, you'd have a hundred little legislatures all deciding what taxes they want to impose, for what purposes they want to impose them.

"What about the other municipal corporations? I think it would surprise a lot of legislators if you found there was that power. I think they'd sit back and say 'whoa! That's not what we intended.' I might say that the legislature this time was requested by the cities to clear up these problems of delegation, clear up the problems raised by Judge Granata, who, by the way, didn't lecture the legislature on how to determine what a proper statute would be, but only upon the importunities of counsel, the request of counsel, said: 'Judge, tell us what you think is wrong with it.' He didn't volunteer it. In fact, he said he didn't want to volunteer it and interfere with the legislature. But a hundred little

legislatures that have that kind of unfettered power is not what the people of this state said they wanted when they adopted the Constitution of 1889.

"Those are very fundamental things. I think just as fundamental as the comments made by Thomas Jefferson in his inaugural address in 1801: 'All too will bear in mind the sacred principle: that though the will of the majority is in all cases to prevail, that will, to be rightful, must be reasonable, that the minority possesses their equal rights which equal laws must protect and to violate which would be oppression.'

"Now, it's not often that you would consider a company or a corporation in the minority, but you've got to realize that the laws have to protect minorities even when they are good-sized companies. It has no officer of that corporation that lives in the City of Sun Valley; the thousand employees, almost none of whom live in the City of Sun Valley, and all of the residents of that city by and large have no businesses in the City of Sun Valley. They're either retired or have business interests elsewhere. It's in these situations where there's opportunity for mischief. All they have to do again is pass one more law in which there's no, no guidelines. Pick the sales tax act. Just pass one more. Let's put a ten percent tax on lift tickets. Let's get another schilling from someone else's pocket. I'm not saying they would do that, but they have the power to do that here and that's not the kind of power that is permitted by the Constitution to be given the City of Sun Valley. And then after they draft the ordinance to be passed upon by the voters of that city and therefore made legal. You can't give the voters of the city more power than the city has to legislate and they can't do it.

"The question is, can the city do it by itself? The answer is, it cannot. And we have clear case law to this effect in the state of Idaho. I would really suggest— and I reread Judge Durtschi's opinion in the *Greater Auditorium* case and this Court's very thoughtful opinion in which this Court itself pointed out the need for

guidelines and standards, including a cap, directly in *Greater Auditorium.* If you're going to follow the law, and I think you will, this is the law of this state. And it's the constitutional will of the people.

"Thank you."

## APPENDIX

## OPINION

In 1978, the Idaho legislature enacted Idaho Code Sections 50–1043 to 50–1049, with the express purpose of alleviating the burden on property owners of providing tax dollars for non-resident services in resort cities. The legislature proposed to allow resort communities and counties, with populations not in excess of· 20,000 (later amended to 10,000), to implement and collect hotel-motel and/or liquor by-the-drink taxes with the provision that sixty percent (60%) of the majority of the voters in an election support the implementation by ordinance of such taxes. Ordinances of these resort communities submitted to the voters must state and define the specific tax, state the exact purpose or purposes for which the revenues will be used, state the rate of the tax and the duration of the tax.

It must be initially recognized that "(t)he Idaho Constitution is a limitation upon, and not a grant of, legislative authority, and the legislature has plenary power in all matters of taxation except as prohibited or limited by the Constitution." *Greater Boise Auditorium Dist. v. Royal Inn of Boise,* [106 Idaho 884, 885, 684 P.2d 286, 287] No. 71, Idaho Supreme Court June 28,· 1984; *Union Pac. R.R. Co. v. Bd. of Tax Appeals,* 103 Idaho 808, 654 P.2d 901 (1982). "The legislature therefore may impose such taxes as it desires, in the absence of an express restriction in the Constitution." *Greater Boise, id.; Idaho Tel. Co. v. Baird,* 91 Idaho 425, 423 P.2d 337 (1967); *State v. Johnson,* 50 Idaho 363, 296 P. 588 (1931); *Idaho County v. Fenn Hwy. Dist.,* 43 Idaho 233, 253 P. 377 (1926); *Shoshone Hwy. Dist. v. Anderson,* 22 Idaho 109, 125 P. 219 (1912). The Idaho Constitution, art.

VII, sec. 2, states: "Revenue to be provided by taxation.—The legislature shall provide such revenues as may be needful, by levying a tax by valuation, . . . ." Art. VII, sec. 6, states as follows: "Municipal corporations to impose their own taxes.—The legislature shall not impose taxes for the purpose of any county, city, town, and other municipal corporation, but may by law invest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation." Art. VII, sec. 6, has been interpreted to prohibit legislative delegation of the power to impose taxation absent safeguards. *Greater Boise, State v. Nelson,* 36 Idaho 713, 213 P. 358 (1923). The *Nelson* court, utilizing this constitutional basis, invalidated a Rexburg city ordinance imposing an occupational license tax for revenue raising purposes. That court noted that the functions of the legislature were to be exercised by it alone, except as authorized by the Constitution. The legislature could not delegate its law-making powers to another authority. The Idaho Supreme Court in *Greater Boise* partially overturned the· ruling in *Nelson* and deemed that the concern of the *Nelson* court in view of the statute involved, "was the lack of standards, guidelines, restrictions or qualifications of any sort placed in the delegating legislation." *Greater Boise,* at 5 [106 Idaho at 886, 684 P.2d at 288]. The *Nelson* court stressed the lack of legislative guidance. *Nelson,* at 719, 720 [213 P. 358]. Further, the *Nelson* court stated:

'Appellant contends that because the legislature is invested with the power given it by sec. 2 of art. 7 to provide revenue for state purposes by other means than a valuation tax, it may invest corporate authorities in towns and cities with power to raise revenue in the same manner. It is a doctrine well established and frequently reiterated by the courts that the functions of the legislature must be exercised by it alone, and that they cannot be delegated, except to the extent and in the manner that may be expressly authorized by the organic law ... All legislative power in the state government

is by article 3 of the constitution vested in the Senate and House of Representatives, and since the law-making power is assigned to the legislature, *it is a fundamental principle of representative government that except as authorized by the constitution, the legislature cannot delegate any of its power to make laws to any other body or authority.'* (Emphasis added.)

And again at 36 Idaho, p. 723, 213 P. at 361:

'In view of the guarded manner in which the legislature has invested the authorities of cities and villages with the power to assess property and collect revenue for corporate purposes, and of the almost universal restrictions and limitations found in the various provisions of the statute limiting the power of the governing boards of counties, cities, villages and other subdivisions of the state, it is not believed that the legislature intended by C.S., sec. 3945, to give to the authorities of cities and villages the power without any limitation to raise any amount of revenue that such governing boards may decide necessary for municipal purposes by a license tax upon the citizens and the business or professions carried on in these municipalities, or by a per capita tax upon the inhabitants of such cities and villages. *But if it was the purpose of the legislature to invest the governing boards of municipalities with such unrestricted power, we think that such power is not given to the legislature by the organic law, and that it cannot invest such authority in municipal corporations.'* (Emphasis added.)

As quoted in *Greater Boise*, at 6 [106 Idaho at 887, 684 P.2d at 289]

The Court in *Greater Boise* quotes from the trial court's analysis of the *Nelson* case when it states:

(I)n short I think the Nelson case really holds, that the purported grant of power in article 7, section 6, did not do away with the separation of powers doctrine, but that the legislature had to act within and in conformance with the doctrine of separation of powers in delegating authority to cities and counties to impose or assess taxes. This obviously has not been done in the statute involved in this case.

*Greater Boise*, at 8 [106 Idaho at 888, 684 P.2d at 290]. The *Greater Boise* court agreed with this analysis and held that the view of *Nelson* allowing municipalities to levy only property taxes was unduly narrow, and to that extent erroneous. It further held, "to the extent that Nelson holds that the legislature may delegate taxing authority to municipal corporations only as to property taxes, it is overruled." *Greater Boise, id.* Additionally it held that certain constitutional standards must be met in any delegation of legislative authority to a lesser entity of government. See Idaho Const., art. III, sec. 1; *Idaho Savings & Loan Assoc. v. Roden*, 82 Idaho 128, 350 P.2d 225 (1960); *Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 499 P.2d 575 (1972). These constitutional standards are met by adequate safeguards built into a statute. The statute involved in *Greater Boise* was Idaho Code Sections 67–4917A to 67–4917C, which specifically defined the incident of the tax, set forth applicable exceptions, set a maximum amount which may be imposed of five percent (5%) and delineated administration and collection of the tax through incorporation of the Idaho Sales Tax Act.

Article VII of the Idaho Constitution is entitled "Finance and Revenue." Additionally, it is noted that art. VII, sec. 16, states that the legislature shall pass all laws necessary to carry out the provision of this article.

In the legislation in the case at bar there is a delegation of legislative power to municipal corporations which are resort cities, as defined by the statute. It is recognized in Idaho that a municipal corporation, as a creature of the state, possesses and exercises only those powers either expressly or impliedly granted to it. *Caesar v. State*, 101 Idaho 158, 610 P.2d 517 (1980); *Sandpoint Water & Light Co. v. City of Sand-*

*point,* 31 Idaho 498, 117 P. 972 (1918); *Boise Development Co. v. Boise City,* 30 Idaho 675, 167 P. 1032 (1917). This position, also known as "Dillon's rule," has been generally recognized as the prevailing view in Idaho. Moore, *Powers and Authorities of Idaho Cities: Home Rule or Legislative Control?* 14 Idaho L.Rev. 143, 147, n. 18 (1977). Under Dillon's rule, a municipal corporation may exercise only those powers granted to it by either the state Constitution or the legislature. The legislature has absolute power to change, modify and destroy those powers at its discretion. *State v. Steunenberg,* 5 Idaho 1, 4, 45 P. 462, 463 (1896).

Thus, a municipal corporation has only those powers which the legislature or the constitution has granted to it. The legislature may delegate powers of taxation through article VII, sec. 6, of the Idaho Constitution only with appropriate safeguards as outlined by the Idaho Supreme Court in *Greater Boise* and *Nelson.*

The United States Supreme Court has recognized such restrictions on the delegation of legislative power, and has invalidated the exercise of unfettered discretion resulting therefrom. *Panama Ref. Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241 [79 L.Ed.2d 446] (1935); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837 [79 L.Ed. 1570] (1935). The United States Court of Appeals, Ninth Circuit, in *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,* 725 F.2d 537 ([9th Cir.] 1984), determined the statutes there reviewed, provided sufficient protection against the erosion of power to overcome constitutional objections. The Eleventh Circuit Court of Appeals in *United States v. Sans,* 731 F.2d 1521 ([11th Cir.] 1984), stated that Congress may not transfer to others the central legislative functions with which it is vested. However, legislative bodies may authorize other entities to determine specific facts, and may also establish general standards and delegate to others the responsibility for effecting legislative policy, if sufficient safeguards are established.

Invalid delegation of legislative authority has been recognized in numerous other states. See *Shattenkirk v. Finnerty,* [97 App.Div.2d 51], 471 N.Y.S.2d 149 (1983); *Rego Properties Corp. v. Finance Adm'r,* [102 Misc.2d 641] 424 N.Y.S.2d 621 (1980); *Danson v. Casey,* [33 Pa.Cmwlth. 614] 382 A.2d 1238 (Pa.1978); *Levine v. Whalen,* [39 N.Y.2d 510] 384 N.Y.S.2d 721 [349 N.E.2d 820] (1976); *State ex rel. Pollution Control Co. v. Kerr McGee Corp.,* 532 P.2d 1386 (Okla.1975); *County Counsel for Montgomery County v. Investors Fund, Inc.,* [270 Md. 403] 312 A.2d 225 (Ct.App. Md.1973); *Southern Illinois Asphalt Co., Inc. v. Environmental Protection Agency,* [15 Ill.App.3d 66] 303 N.E.2d 606, (Ct.App. Ill.1973); *U.S. Steel v. State,* [65 Wash.2d 385] 397 P.2d 440 (Wash.1964); *Broadhead v. Monaghan,* [238 Miss. 239] 117 So.2d 881 (Miss.1960).

The Idaho legislature has statutorily delegated to municipal corporations numerous general powers, as delineated in Idaho Code Sec. 50–301 (1980). Specific powers are detailed in subsequent statutes. See Idaho Code, Title 50 (1980). It should be carefully noted that in each of these delegations of power to a municipal corporation, there are specific limitations upon taxation powers granted, except within those statutes which specifically deal with property taxes or taxes which are in the form of a regulation and not revenue raising. See specifically Idaho Code Sec. 50–235 (1980) Tax levy for general and special purposes (maximum allowed of 45 mills on the dollar in a one year period); Idaho Code Sec. 50–236 (1980) Capital improvement fund levy—Limitations; Idaho Code Sec. 50–303 (1980) Recreation and culture (... levy a special tax not to exceed three mills for recreational programs); Idaho Code Sec. 50–307 (1980) License occupations and businesses (a regulation, not a tax); Idaho Code Sec. 50–312 Improvement of streets, special levy (a property tax under *Nelson* ); Idaho Code Sec. 50–317 (1980) Removal of snow, ice, rubbish and weeds (a property tax under *Nelson,* but also limited by Idaho Code Sec. 50–1008 (1980)); Idaho Code Sec. 50–321 (1980) Aviation facilities, acquisi-

tion, operation and maintenance (amount not to exceed three mills on the dollar in any one year); Idaho Code Sec. 1008 (1980) Collection of Special Assessments, Certification to Tax Collector, Widows' Exemption (time and method of collection).

Idaho Code Sec. 50–1043 (1980) to 50–1049 (1980) is in sharp contrast with other statutes enabling municipal corporations to tax. It does not contain a maximum allowable tax. It, in and of itself, allows for more than one tax to be imposed. It delegates to the municipal authorities the determination for which purposes those tax revenues will be used. In addition to their determination of the specific tax and amount of tax to be imposed, the duration of the tax is also delegated to determination by the municipal authorities.

It is argued by the defendants City of Sun Valley and City of Ketchum that this delegation is safeguarded by the requisite sixty percent (60%) majority approval by voters of the proposed city ordinances pursuant to these statutes. It is argued that this simple majority approval is akin to the majority vote which may be utilized to exceed a ten mill rate of taxation throughout the state, encompassed in the Idaho Constitution, article VII, sec. 9, or in the statutory method of exceeding tax and revenue limitations set forth in Idaho Code Sec. 39–1334(b) (1984 Supp.) and Idaho Code Sec. 63–2220(2) (1984 Supp.). It should be noted that there is a limitation on the amount which the levy may be increased contained in such statutes. Additional safeguards are contained in Idaho Code Sec. 39–1334(b) (1984 Supp.). Idaho Code Sec. 63–2220 (1984 Supp.) additionally contains other limitations on override levies.

This court concludes and therefore holds that the sixty percent (60%) majority approval of a municipal ordinance, enacted pursuant to Idaho Code Sec. 50–1041 through Sec. 50–1049, does not provide adequate safeguards in the form of standards, guidelines, restrictions or qualifications of any sort to validate the delegation as constitutionally required pursuant to the Idaho Supreme Court's holding in *Greater Boise,*

interpreting *Nelson.* Such constitutional standards must be met in any delegation of legislative authority to a lesser entity of government.

Additionally, this court holds that a sixty percent (60%) voter approval of municipally adopted ordinances is not the equivalent of a statutory referendum in the form of direct legislation which would be in lieu of delegation, as delineated by the United States Supreme Court in *City of Eastlake v. Forest City Ent., Inc.,* 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976). In that case the United States Supreme Court held that the referendum cannot be characterized as a delegation of power, and that the doctrine that legislative delegation of power to regulatory bodies must be accompanied by discernable standards is inapplicable where, rather than a delegation of power, the power being exercised is one reserved to the people themselves. In that case, the Ohio State Constitution reserved to the people of each municipality in the state the power of referendum. Similarly, the Idaho Constitution reserves to the people of the state of Idaho the power of initiative and referendum, as statutorily defined by the legislature. Idaho Const. art. III, sec. 1; Idaho Code Sec. 34–1802 (1981); Idaho Code Sec. 34–1803 (1981); Idaho Code Sec. 50–473 (1980); Idaho Code Sec. 50–501 (1980). The Idaho Constitution, in article III, sec. 1, states:

> The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature. This power is known as a *referendum,* and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection. (Emphasis added.)

> The people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature. This power is known as the *initiative* and *legal voters may, under*

*such conditions and in such manner as may be provided by acts of the legislature,* initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection. (Emphasis added.)

In the case at bar, no referendum or, more properly in this factual situation, no initiative was proposed or took place. The voting which took place and approved the ordinances established were not statutorily defined referenda or initiatives. It has been determined by the Idaho Supreme Court that the filing requirements of the referendum section must be strictly construed. *Idaho Water Resources Bd. v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976). This court further determines that the municipal election held in the defendant City of Sun Valley was not the functional equivalent of an initiative or referendum.

Additionally, this court determines that for a referendum or initiative to be utilized as an alternative to legislative delegation of taxation power, such referendum or initiative must be at the state level. The inherent power of the voters of this state to approve or reject, initiate and develop legislation, in effect acting as a legislature themselves, is in existence at the state level only. As has been previously stated, municipal corporations only have powers which are statutorily or constitutionally granted to them. Municipal corporations do not have other inherent powers of taxation. Without a valid delegation of these powers of taxation, municipal corporations are powerless to enact such ordinances. For this reason, an initiative or referendum at the municipal level is not the equivalent of a reservation of a power of the people to act as a super legislature. This reserved power of the people must be at the state level, as an alternative to legislative delegation. Just as the legislature cannot, under *Greater Boise* and *Nelson,* delegate without adequate safeguards, guidance and standards to municipal corporations, neither can they delegate to a lesser entity, nor to the voter electorate of that municipality, to enact legislation.

This difference between ordinances which receive majority voter approval and a true referendum is recognized in *American Assoc. of Exporters & Importers— Textile & Apparel Group v. United States,* 583 F.Supp. 591 (C.I.T.1984); *Southern Alameda Spanish Speaking Org. v. City of Union City, Calif.,* 424 F.2d 291 (9th Cir.1970).

This court holds that the majority municipal voter approval of an enacted city ordinance is not the functional equivalent of a constitutionally and statutorily defined referendum.

This legislation contains no such redeeming safeguards as the maximum amount of tax, exemptions, incidence of such tax, or mandatory administration and collection procedures, contained in the statutes considered in *Greater Boise.* Analogous standards and restrictions are required for the validity of this delegation.

This court further concludes that Idaho Code Sec. 50–1041 to Idaho Code Sec. 50–1049 are unconstitutional as an invalid delegation of legislative authority to municipal corporations, absent requisite standards, guidelines, restrictions or qualifications of any sort placed in the delegating legislation. Additionally, this court holds that such legislation is a delegation of legislative power, and is not a power which is reserved to the people and thus implemented through referendum or initiative.

Due to the invalid legislative delegation, this court determines that the entire "City Property Tax Alternatives Act of 1978" is invalid. Absent such delegation, this legislation lacks meaning and purpose. It is recognized that the legislation does contain, in the Session Laws, Sec. 7, a severability clause as follows:

SECTION 7. PROVISIONS RULED INVALID. If any section, subdivision, paragraph, sentence, clause, or provision of this act shall be unconstitutional or ineffective for any reason, in whole or in part, to the extent that it is not unconstitutional or ineffective it shall be valid and effective and no other section, subdi-

vision, paragraph, sentence clause, or provision shall on account thereof be deemed invalid or ineffective.

Session Laws 1978, ch. 261, at 569. As the legislature routinely includes severability clauses in nearly every statutory enactment, such clause may not necessarily be indicative of legislative intent. Additionally, a severability clause has not necessarily been determinative of severability. *Barndollar v. Sunset Realty Corp.,* 379 So.2d 1278 (Fla.1979); *County of Clark v. City of Las Vegas,* [92 Nev. 323] 550 P.2d 779 (Nev.1976). It has been determined that such language does not divest the courts of power, nor relieve them of their duty to determine whether the remainder of the statute can stand independently, and whether the legislature as a body would so intend. *Lynden Transport, Inc. v. State,* 532 P.2d 700, 711–713 (Alaska 1975). It has been stated, "Separability clauses should be given reasonable consideration, but should not, at least under present usage, be paid undue homage." *County of Clark,* at 788. Justice Brandeis stated in *Dorchy v. Kansas,* 264 U.S. 286, 290, 44 S.Ct. 323, 324 [68 L.Ed. 686] (1924):

> But a provision inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.... (A severability clause) provides a rule of construction which may sometimes aid in determining that intent. But is an aid merely; not an inexorable command.

This court determines under this two-part test that, standing alone, the remainder of the statute cannot be given legal effect and that the legislature would not have intended that those remaining portions of the legislation be determined to be valid, standing alone. Therefore, the entire statute will be held unconstitutional and invalid.

This court further concludes that City of Sun Valley ordinances No. 123 and No. 165 are invalid, as based upon an unconstitutional and invalid state statute, and as enacted pursuant thereto.

In light of this court's holding on the issue of delegation and its determination that the statute is unconstitutional, this court makes no determination on the issues of potential violation of constitutional prohibitions against local and special laws and potential violation of equal protection and due process provisions of the Idaho or federal Constitutions.

Based upon the above, the court issues the following Order:

### ORDER

NOW, THEREFORE, IT IS ORDERED that the plaintiff Sun Valley Company's Motion for Summary Judgment be, and the same is hereby granted, in all respects, in Blaine County case No. 12159.

Counsel for the plaintiff Sun Valley Company is hereby requested to prepare an appropriate Summary Judgment, for the signature of this court, consistent with the above Opinion and Order.

DATED this 21st day of November, 1984.

/s/ Geo. Granata, Jr.
GEORGE GRANATA JR.
District Judge